CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

August 04, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **EVAN HATCHER MEADE,** | ) |
| Plaintiff, | ) Case No. 7:24CV00073 |
| v. | ) **MEMORANDUM OPINION** |
| **WEXFORD HEALTH SOURCES, INC., ET AL.,** | ) By Robert S. Ballou |
| | ) United States District Judge |
| Defendants. | ) |

This civil rights case under 42 U.S.C. § 1983 is before me on the defendants' Motion for Summary Judgment, and the pro se plaintiff, Evan Hatcher Meade, has responded, making the matter ripe for disposition. After review of the parties' submissions, including the undisputed medical record, I conclude that Meade received extensive medical attention, and that the defendants are entitled to summary judgment.

I. BACKGROUND.

A. Meade's Allegations.

Meade's claims rest on alleged events that occurred while he was confined at the Southwest Virginia Regional Jail facility (SWVRJ) in Haysi, Virginia. He states that on three occasions in 2023, he developed what he "believed to be staff/mersa [sic] infection[s]" that twice led to his hospitalization. He sues nurses Margie Coleman and Lavinia Mullins, both employees of Wexford Health Sources, Inc., for "medical neglect/medical indifference." Compl. 3, ECF No. 1.

More specifically, Meade alleges that Nurse Practitioner (NP) "Crystal Large ordered for [Meade] to be given 450 mg of antibiotics morning and night on 12-12-23 [and Mullins] failed to chart [NP Large's] order which led to [Meade] being denied medical treatment." *Id.* at 2. Meade further asserts that "nurse [Coleman] denied [him] medical treatment and lied to [him] on the

inmate sick call system, stating that per [NP Large, t]here was no order given and that a culture of the place on [his] leg must be done before they could treat [him]." *Id.* He alleges that according to NP Large, Coleman "never contacted her and [told him] that [he] should have received treatment." *Id.* Meade seeks monetary damages for pain, suffering, and disfigurement.

I liberally construe Meade's Complaint as alleging the following claims for relief:

1. Defendant Mullins failed to chart NP Large's order for antibiotics on December 12, 2023, causing Meade to be denied the ordered treatment.

2. When Meade asked for the medication NP Large had ordered, defendant Coleman falsely informed him that "there was no order given" and that no treatment could be provided until a culture was done on the leg injury.

Meade attempts to use his unverified response to the defendants' motion, ECF No. 22, to raise additional facts about the three infections he developed at SWVRJ Haysi. The first of these infections occurred in August 2023 on his neck and chin. The medical staff assessed and provided care, but ultimately, they had him transported to a local hospital for treatment. Meade does not allege any constitutional violation by Mullins or Coleman related to his course of treatment for this infection.

The second infection occurred under Meade's right eye. On November 16, 2023, Meade allegedly told Coleman about it while she was conducting pill pass. He reports that Coleman said she would not give him any treatment during pill pass. Later that day, an officer escorted Meade to the medical unit, where Coleman assessed his condition and gave him "benadryl and shot of solumedrol [sic]." Resp. 4, ECF No. 22. The affected area on Meade's face continued to swell and cause pain, so on November 18, 2023, he asked again for medical attention. Nursing staff assessed him and contacted NP Large, who sent Meade to the local emergency room, where he received IV antibiotics. This infection allegedly left a permanent, pea-sized scar. The Complaint does not allege that Mullins had any involvement in Meade's course of treatment for this infection.

The third infection was the one described in the Complaint, although Meade offers more facts about it in his response. He alleges that on December 10, 2023, he killed a spider in his cell, and the next day, he noticed a red bump on his right calf. He pointed it out to a nurse while receiving his daily medication. The nurse gave him alcohol "swab pods and told [him] to keep it clean." *Id.* The next day the bump was quarter-sized. Mullins examined it while Meade was getting his medications. Mullins went into NP Large's office, and Meade overheard NP Large give Mullins "the verbal order to start [Meade] on clindimicine [sic] 450 mg morning and night." *Id.* at 4-5. Meade admits that no other staff knew of NP Large's order, "even though [he] voiced it to [Coleman] at pill pass" and while getting his medications. *Id.* at 5. Meade wrote a sick call request asking for the medication NP Large had ordered. Meade alleges that Coleman's response "led [him] to believe that she had talked to NP Large and NP Large had advised her a culture had to be taken before [he] received any treatment." *Id.* NP Large allegedly told Meade later that Coleman never contacted her, and had Coleman done so, NP Large would have told her about the prior verbal order for Meade to receive medication immediately. On December 15, 2023, other nurses examined Meade's leg, took pictures of the affected area, and sent them to NP Large, who ordered Meade a "ten-day course of Bactrim and Rocephin, a three-day course." *Id.*

B. The Defendants' Evidence.

In support of their arguments for summary judgment, the defendants present Mullins' affidavit that summarizes the course of medical attention provided to Meade as reflected in the medical records attached to the affidavit, related to the three infections of which Meade complains. Mullins states that she is a licensed practical nurse who had worked in the correctional setting for twenty years. She provided nursing care to inmates at SWVRJ facilities until December 2023, when she left because of a cancer diagnosis.

Meade was booked into SWVRJ Haysi on May 30, 2023. During an intake medical screening, he did not indicate any medical issues other than a headache. In July 2023, Meade filed sick call requests complaining of swelling in his left knee. The nursing staff assessment on July 7, 2023, showed that Meade suffered from a left knee infection and cellulitis. After a second examination that day, staff noted that the knee was still inflamed, but the swelling had decreased, and the patella was dry with no drainage. On July 16, 2023, staff examined Meade again for a complaint of a sore knee and noted swelling and redness with no drainage. NP Large placed a verbal order for clindamycin 450 mg (an antibiotic) for ten days.

On August 8, 2023, NP Large saw Meade after he reported that his knee was swollen and had begun to come out of its socket. He stated that he had injured his knee several years earlier in the mines. NP Large ordered a left knee brace, and a note from Mullins on August 11, 2023, indicates that the brace was issued to Meade.

On August 16, 2023, Meade filed a sick call asking for antibiotics for "a place" on his neck. After examination, a nurse noted a red, enlarged, draining area under Meade's chin. A provider ordered a ten-day course of Bactrim (an antibiotic) and warm soaks and compresses as needed. Notes from the next day indicate that Mullins and another nurse had applied a warm compress to Meade's neck and that Meade had taken his prescribed medication. On August 19, 2023, Meade's prescription for Bactrim was discontinued, and he was started on Clindamycin and Rocephin.

Medical staff reported to Meade's cell at 3:25 a.m. on August 20, 2023, after he complained that he could not breathe. When staff arrived, Meade was sitting on a table, stating that he had been having chills and could not take a deep breath due to sharp pain in his left lung. Due to his shortness of breath, staff could not assess his lung sounds. His oxygen level was 98% and his vital signs were within normal limits, except his heart rate was 120 beats per minute. His right lymph

node was swollen and tight. Staff contacted the provider who ordered Meade's transfer to the hospital.

Meade was admitted and received three IV bags of antibiotics and two steroid injections. Hospital records describe his admission for cellulitis on his neck, with an ingrown hair as the likely origin. Meade underwent a surgical consult for a possible incision and drainage, but hospital providers decided against this procedure. On August 22, 2023, hospital staff advised jail personnel that a culture taken from Meade's neck had come back positive for multidrug resistant organisms, and he would stay overnight to receive IV Vancomycin. Meade was discharged back to the Haysi facility on August 23, 2023, with his wound nearly resolved. At the jail, staff housed him in the medical unit for five days, until he was medically cleared to return to the general population. Notes from a follow up exam on August 30, 2023, indicate that Meade reported feeling better and that the two open areas on his neck were healed and no longer draining.[1]

On November 16, 2023, Coleman came to Meade's cell after he complained of breathing problems. He walked without difficulty to the lobby, where Coleman examined him. She noted visible swelling on his forehead above his left eye and his report that he could not breathe from his nose. Coleman recorded that NP Large had been notified of Meade's facial swelling and had ordered Solomedrol and Benadryl for him. Coleman administered a dose of Solmedrol in his left gluteal muscle.

On November 18, 2023, Meade complained of facial swelling. Nursing staff noted that his face was significantly swollen and he had a small abrasion on the right side of his face. His vital signs were within normal limits with no shortness of breath. Hearing this information, NP Large

---

[1] In September and October 2023, the nursing staff provided assessment and/or treatment to Meade on separate complaints of a spot near his knee, cold symptoms, and a rash, all apparently unrelated to the infections at issue in this lawsuit.

sent Meade to the local emergency department and later placed verbal orders for Bactroban, Keflex, and Cleocin as advised by providers. Nurse Mullins administered a Rocephin injection to Meade that day.

Nursing staff saw Meade again on November 19, 2023, and noted his face was swollen with a darkened area on the side of his nose and swelling around his eyes. A nurse applied a warm compress and gave Meade some pads to use to continue warm compresses in his cell.

Notes from Meade's follow up visit with the provider on November 21, 2023, indicate that he reported feeling better, but still had some pain and tenderness. Staff also recorded observations of swelling to the right peri-orbital area onto his forehead and a small pea-sized scabbed area to the right side of his face under his nose. NP Large ordered 800 mg of Ibuprofen as needed for a week and indicated Meade could be medically cleared when drainage stopped.

On December 14, 2023, Meade filed a sick call request for antibiotics for a spider bite. He wrote that "crystal" had ordered 450 mg of "them green capsules morning and night." Mem. Supp. Mot. Summ. J. (Mem.) Ex. B 93, ECF No. 18-2. In a second request, Meade wrote that "crystal" had told "lee" to start him on Clindamicin [sic] but its ok ill wait till tomorrow to get something done." *Id.* at 94. Nursing staff responded that no order had been charted and that his leg "will need to be cultured first before anything can be done for it per Crystal." *Id.* Based on review of Meade's medical records, Mullins states that as of December 14, 2023, no order for Clindamycin appeared in his chart. As such, if NP Large ordered medication for Meade on December 12, 2023, as Meade alleges, that order was not documented, and Coleman would not have known about it while drafting her responses to his requests.

On December 15, 2022, a nurse saw Meade for wound care after he complained of a spider bite. The nurse noted the swollen center of the wound was the size of a small egg with redness

around it, but no drainage. Meade reported that his pain was 7/10 and radiating. Nursing staff charted a verbal order from NP Large for Meade to receive a ten-day course of Bactrim, an oral antibiotic, and a three-day course of Rocephin, an intramuscular antibiotic.

On December 17, 2023, nursing staff saw Meade again, noting that his right calf was red and swollen with a hardened area that appeared to be getting larger daily. Meade also complained that his groin lymph nodes were swollen. Staff applied a wet to dry dressing, administered a Rocephin injection, and referred Meade to a provider.

A provider examined Meade on December 18, 2023, noting a possible abscess versus cellulitis to the right lower leg. This provider noted that Meade had completed doses of Rocephin and was being treated with Bactrim. The provider documented that Meade had an erythematous wound with eschar and a fluctuant center. She then performed an incision, removed purulent drainage, and irrigated, packed, and dressed the wound. She updated Meade's antibiotics to include Clindamycin 450 mg for ten days and three additional rounds of Rocephin. Staff directed Meade to keep his wound covered until it healed, and he verbalized understanding.

For several days, nursing staff performed regular wound care and dressing changes. On December 27 and 28, 2023, staff noted finding Meade without a dressing on his lower leg twice in two days and replaced the dressing using tape. On January 2, 2024, Coleman saw Meade in medical for wound care. He arrived with no dressing on his leg and reported that he had taken a "good hot shower last night and the black scab came off." *Id.* at 155. Coleman examined the wound and noted no drainage or odor and documented that Meade was scheduled to see the provider. She cleaned the area with Betadine and taped on a wet to dry dressing.

Later on January 2, 2024, NP Large reported examining Meade for follow up on the abscess to his right leg, which he reported was much better. She noted that the area was still open, but

without drainage.  Also on January 2, 2024, NP Large documented that on December 12, 2023, Meade had come to medical for his dose of Buprenorphine and told NP Large about a hard, red, raised area on his leg which he thought was a spider bite.  NP Large noted that on December 12, 2023, she had given an order to Mullins for Meade to receive a ten-day course of Clindamycin.  The medical charting does not include a written version of this order or any notes indicating that any staff member carried out such an order.

Mullins states that she does not recall receiving a verbal order from NP Large on December 12, 2023.  She reports that per nursing protocols and her routine practice, when a provider ordered medication, she would enter the order that same day so the pharmacy could fill it and nursing staff could administer it to the patient at the next pill pass.  Mullins says it is possible that NP Large directed her to input an order on December 12, 2023, and Mullins simply forgot to do so.  She reports that in mid-December of 2023, she was experiencing lightheadedness and other physical manifestations of her then-undiagnosed cancer.  Just days after December 12, 2023, she fainted at work, which ultimately led to her cancer diagnosis.

According to NP Large's medical assessment of Meade on January 2, 2024, the area on his leg had almost healed and no longer required packing.  NP Large documented that Meade had pulled off his scab, but was otherwise doing well.  On January 13, 2024, Meade submitted a sick call request stating that the place on his leg had started to drain again.  A nurse examined him later that day and noted no drainage at that time.  She advised Meade to keep the wound covered with his pant leg and to notify medical if the drainage continued or worsened.[2]

---

[2] On February 14, 2024, nursing staff saw Meade for a complaint about an infected hair on his neck, and NP ordered a ten-day course of Clindamycin.  Evidence does not suggest that this infection was related to the incidents at issue in this case.

-8-

II. Discussion.

A. Standards of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"[C]ourts are obligated to liberally construe pro se complaints, however inartfully pleaded." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 (4th Cir. 2017).[3] A pro se litigant's verified complaint must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021)

Section § 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his *constitutional* rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). To the extent that Meade was a pretrial detainee while at SWVRJ Haysi in 2023, his medical claims under § 1983 must be assessed under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment as Meade proposes. *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). As a detainee, Meade may prevail on his claims if he shows that (1) he had "a medical condition or injury that posed a substantial risk of serious harm," (2) that the defendant "intentionally, knowingly, or recklessly acted or failed to act to appropriately

---

[3] I have omitted internal quotation marks, alterations, and/or citations here and throughout this Memorandum Opinion, unless otherwise noted.

address the risk that the condition posed," (3) that the defendant "knew or should have known (a) the detainee had that condition" and (b) the defendant's response "posed an unjustifiably high risk of harm," and (4) "as a result, the detainee was harmed." *Short ex rel. Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). In short, "it is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.*

A medical condition is "objectively serious if it diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 612. "[W]here a deliberate indifference claim is predicated on a delay in medical care [ . . . ] there is no Eighth Amendment violation unless the delay results in some substantial harm to the patient, such as marked exacerbation of the prisoner's medical condition or frequent complaints of severe pain." *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018). Finally, as to the defendant's knowledge of or response to the plaintiff's condition, it is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611-12. Mere negligence and even medical malpractice cannot support a constitutional claim.

## B. Nurse Mullins.

As to Meade's claim concerning Mullins' actions or inaction on December 12, 2023, I find that he has met parts of the constitutional analysis, an objectively serious medical need and a failure to act appropriately that day to address the risk that condition posed to Meade. *Short*, 87 F.4th at 612. It is undisputed that on December 12, 2022, based on assessment of Meade's condition at that time, NP Large gave an order for a ten-day course of Clindamycin to Mullins. Mem. Ex. B 157, ECF No. 18-2. This order reflects NP Large's diagnosis that the affected area on Meade's

leg mandated treatment, which she then verbally ordered, but which was not promptly charted or provided as appropriate under nursing protocols.

Meade has not stated facts, however, showing that Mullins's actions or inaction on December 12, 2023, were anything more than negligence. Mullins states that she does not recall whether NP Large gave her a verbal order on December 12, 2023, and she reports that her habit was to chart verbal orders the same day so the patient could receive the treatment ordered. Mem. Ex. A, Mullins Aff. ¶ 9, ECF No. 18-1. She admits the possibility that NP Large did give the alleged order, but Mullins forgot to chart it. She posits that symptoms of her then-undiagnosed cancer may have caused her to act in such an uncharacteristic manner. This scenario presents not recklessness, but mere inadvertent, negligent failure to carry out her duties.

Moreover, the record demonstrates that the medical staff worked diligently to treat Meade's leg sore and that any minor harm resulting from the short delay in treatment was largely due to Meade's own delay in advising staff of the problem. Meade alleges hearing NP Large give an order to Mullins on December 12, 2023, Resp. 4-5, ECF No. 22. But Meade waited until December 14, 2023, to file two sick call requests about not yet receiving the treatment NP Large had ordered. Mem. Ex. B 93, 94, ECF No. 18-2. He provides no evidence that he made any written or verbal complaints to staff in the interim about not receiving the treatment or experiencing severe pain. In fact, in one of the requests, Meade stated, "its ok ill wait till tomorrow to get something done thank you." *Id.* at 94. Chart notes reflect that the next day, on December 15, 2023, nursing staff assessed Meade and entered a verbal order by NP Large for Bactrim and Rocephin. *Id.* at 9. Records also indicate that Meade received a Rocephin injection on December 17, 2023, and by December 18, 2023, had completed three doses of Rocephin and had been receiving Bactrim, both antibiotics. *Id.* at 9, 157. That day, a provider updated Meade's treatment by including Clindamycin 450 mg

for ten days and three more rounds of Rocephin. *Id.* He received his dose of Clindamycin on December 18, 2023, and continued receiving this medication until December 28, 2023. *Id.* at 148-49.

When NP Large documented on January 2, 2024, that she had given Mullins an uncharted verbal order to start Clindamycin on December 12, 2023, she also reported her assessment on January 2, 2024, that Meade's leg wound was almost healed. *Id.* at 157. Thus, the undisputed medical record indicates that Meade began receiving antibiotics for his leg sore three days after NP Large's first verbal order and over the next two weeks or more, continued to receive additional medications until the sore healed. Certainly, Meade provides no medical evidence that failure to start treatment with Clindamycin on December 12, 2023, hampered the healing of his sore to any significant extent, exacerbated the condition, or caused him significant pain. *Formica*, 739 F. App'x 745, 755

For the reasons stated, I conclude that Meade fails to present any material dispute of fact on which he could persuade a fact finder that Mullins acted "intentionally, knowingly, or recklessly" by failing to chart NP Large's order for medication for Meade's leg wound on December 12, 2023. *Short*, 87 F.4th at 611. At the most, the record reflects possible negligence, which is insufficient to support Meade's claim against Mullins. Therefore, Mullins is entitled to summary judgment as a matter of law.

### C. Nurse Coleman.

Meade properly raises only one claim against Coleman. It concerns his sick call request dated December 14, 2023, and submitted at 8:50 p.m., complaining that no one had provided the medication NP Large had ordered on December 12, 2023. Meade alleges that Coleman responded with two falsehoods: that no order was given and that no treatment could be provided without

doing a culture first on the leg sore. I conclude that Meade fails to state facts showing how these alleged statements or any related action or inaction by Coleman violated his constitutional rights.

First, the record reflects Coleman did not lie when she wrote on December 14, 2023, that she found no order charted regarding the treatment Meade claimed NP Large had ordered for him on December 12, 2023. In fact, NP Large's order that day for Clindamycin for Meade does not appear in his medical chart at all, except as an after-the-fact note in NP Large's charting of her examination of Meade on January 2, 2024. Mem. Ex. B 154, ECF No. 18-2. Moreover, neither the January notes nor any other medical record indicates that anyone carried out NP Large's December 12, 2023, order for Clindamycin. Meade cannot prove that Coleman knew or should have known of and acted upon a verbal order that she never heard or saw. Furthermore, a chart note indicates that on December 15, 2023, NP Large gave a verbal order for Meade to receive different medications—Bactrim and Rocephin. *Id.* at 9. On December 18, 2023, another provider noted that Meade had received, or was receiving, these medications. *Id.* at 157. This provider incised and drained Meade's leg sore and prescribed Clindamycin and more Rocephin. *Id.*

Second, the record does not support Meade's claim that Coleman lied or misled him to believe she had consulted NP Large before responding to his sick call request about the December 12, 2023, order for Clindamycin. On December 14, 2023, at 9:00 p.m., Coleman wrote: "it [the leg sore] will have to be cultured first before anything can be done for it per Crystal [Large]." *Id.* at 94. NP Large may well have told Coleman at some earlier time that culturing a leg sore before treating it was the usual practice. More importantly, however, the record does not support a finding that Coleman knew or should have known on December 14, 2023, that her actions or inaction that day posed a serious risk of harm to Meade. In fact, his sick call request itself said getting medication the following day would be fine with him. Given the medications Meade thereafter

received beginning on December 15, 2023, he also fails to show that Coleman's action or inaction resulted in harm to him. Finding no material disputed fact on which Meade could prevail in his claim against Coleman, I conclude that Coleman is entitled to summary judgment as a matter of law.

In a sequence of facts alleged only in response to Coleman's motion, Meade appears to assert an additional claim against her. He alleges that on November 16, 2023, while Coleman was conducting pill pass, he told her about an infection under his eye; she allegedly replied that "she was not going to give [him] anything no antibiotics or pain reliever and for [him] to get out of her pill pass line." Resp. 4, ECF No. 22. Because Meade did not present any claim concerning this encounter in his Complaint or in an Amended Complaint, it is not properly before the court. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). The rule is no different for pro se plaintiffs. *Hoglan v. Mathena*, No. 7:18-cv-00140, 2022 WL 625086, at *17 n.12 (W.D. Va. Mar. 3, 2022) (noting rule that *pro se* litigant "must follow procedure rules" and therefore "cannot raise new claims in his brief opposing summary judgment").[4]

---

[4] Meade also apparently seeks to bring nondispositive motions in his responses to the defendants' summary judgment motion. He asks the court to subpoena certain officers or nurses as witnesses to the defendants' alleged violations; he directs the court to investigate his claims and to obtain and view video footage to prove he sometimes did not receive all prescribed doses of medication and was not provided a cart to transport his belongings from one cell to another while he had an unhealed sore on his leg. Resp. 1, 4, 6, ECF No. 22. Buried at the end of another response on summary judgment, Meade says he wants "1 more continuance" for unspecified purposes and duration and states that he is "currently seeking legal counsel." Resp. 2, ECF No. 27.

I conclude that these attempted motions must be denied. "A request for a court order must be made by motion," not tucked away in responsive briefs, and they must state clearly the grounds for the motion and the relief sought. Fed. R. Civ. P. 7(b). Meade had ample time to develop his evidence and does not explain any specific reason he needed additional time. Moreover, investigation and evidence gathering are not court functions. The litigant or his attorney must investigate his claims and obtain the evidence to support them, and no attorney has entered an appearance on Meade's behalf. Finally, after reviewing the

Even if Meade had properly raised the claim, however, it is without merit. The evidence, including his own allegations, indicates that later that same day, an officer took Meade to the medical unit with his eye "almost swollen shut" and in "severe pain" with difficulty breathing. *Id.* at 4-5. Coleman documented his breathing problems and provided medications that NP Large had prescribed to address his condition. Mem. Ex. B 159, ECF No. 18-2. Meade claims that thereafter, his face continued to swell and cause pain. When he sought medical attention on November 18, 2023, NP Large ordered officers to transport him to a local emergency room where he received IV antibiotics. *Id.* at 10.

Apparently, Meade is claiming that Coleman should have responded differently to his requests for medical care on November 16, 2023. His allegations and the defendants' evidence, however, show that after Coleman treated him that day, his symptoms worsened and changed. Providers who treated him at the hospital based on symptoms he exhibited while there recommended Bactroban, Keflex, and Cleocin, which NP Large prescribed. *Id.* The record simply does not support a finding that Coleman knew or should have known her actions or inaction on November 16, 2023, posed an unreasonable risk of harm to Meade or caused him harm.

Based on the foregoing, I conclude that Meade has not presented any material disputed fact on which he could persuade a fact finder that Coleman's actions at issue violated his constitutional rights. Finding that Coleman is entitled to summary judgment as a matter of law, I will grant her motion.

---

witness requests and the video sought, I cannot find that any of this evidence could create a material dispute on which Meade might prevail on his claims against the defendants in this case.

D.  Wexford Health Sources, Inc.

To hold Wexford Health Sources, Inc. (Wexford) responsible for a §1983 violation, Meade must state facts showing that Wexford had an official policy or custom that caused Meade to receive the allegedly inadequate medical care of which he complains. *Kline v. Wicomico Cnty.*, No. CV BPG-21-2653, 2022 WL 1538625, at *3 (D. Md. May 16, 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  In other words, Meade must show "a direct causal link" between a Wexford policy or custom and "the alleged constitutional deprivation,"" namely, the alleged denials of medical care by Mullins and Coleman. *Kline*, 2022 WL 1538625, at *3.

Meade fails to meet this factual requirement.  He does not state facts showing that any Wexford custom or policy caused or even influenced the actions by Mullins or Coleman that Meade is challenging.  Indeed, he does not mention any Wexford policy or any other direct involvement by this entity in his medical care related to the incidents at issue in this case. Therefore, I conclude that Wexford is entitled to summary judgment as a matter of law.

III.  CONCLUSION.

For the reasons stated, I will deny Meade's attempted motions in responsive briefs, seeking to amend his claims, to subpoena witnesses, and to obtain video footage and I will grant the defendants' Motion for Summary Judgment.  A separate Final Order will issue herewith.

Enter:  August 4, 2025

/s/ Robert S. Ballou

Robert S. Ballou
United States District Judge